IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DEIONTA MCQUEEN,
Petitioner,

vs. Case No.: 4:17cv573/RH/EMT

MARK S. INCH,[1]
Respondent.
_______________________________________/

**ORDER and REPORT AND RECOMMENDATION**

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 12). The court provided Petitioner an opportunity to file a reply (*see* ECF No. 13), but he has not done so.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues presented by the parties, it is

[1] Mark S. Inch succeeded Julie Jones as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)

the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I. BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 12).[2] Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2011-CF-3481, with one count of armed robbery with a firearm (Count I), one count of aggravated battery with a firearm (Count II), and one count of grand theft of a motor vehicle (Count III) (Ex. A at 10). Following a jury trial, he was found guilty of armed robbery with a firearm, and not guilty of the remaining two counts (Ex. A at 48–49, Exs. B, C, D). On February 1, 2013, Petitioner was sentenced to 15 years in prison, with a 10-year mandatory minimum and jail credit of 451 days, followed by a 5-year period of probation (Ex. A at 53–69, 93–105).

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 12). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-780 (Ex. A at 70, Ex. F). The First DCA affirmed the judgment per curiam without written opinion on June 18, 2014 (Ex. F). The mandate issued July 15, 2014 (*id.*). *McQueen v. State*, 145 So. 3d 835 (Fla. 1st DCA 2014) (Table).

On July 24, 2015, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. G at 3–19). The state circuit court held an evidentiary hearing on September 30, 2016, at the conclusion of which the court denied the Rule 3.850 motion (*id.* at 24–25, 27–84). Petitioner appealed the decision to the First DCA, Case No. 1D16-5097 (Ex. G at 26, Ex. H). The First DCA affirmed the judgment per curiam without written opinion on September 26, 2017, with the mandate issuing October 24, 2017 (Ex. J). *McQueen v. State*, 48 So. 3d 938 (Fla. 1st DCA 2017) (Table).

Petitioner filed the instant federal habeas action on December 13, 2017 (ECF No. 1).

## II.   STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 ("AEDPA"). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154

L. Ed. 2d 263 (2002) (“Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.”). Where there is no Supreme Court precedent on point, the state court’s conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: “Because none of our cases confront the specific question presented by this case, the state court’s decision could not be contrary to any holding from this Court.” (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner’s claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the “contrary to” clause is not satisfied, the federal habeas court next determines whether the state court “unreasonably applied” the governing legal principles set forth in the Supreme Court’s cases. The federal court defers to the state court’s reasoning unless the state court’s application of the legal principle(s) was “objectively unreasonable” in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct.

2736, 159 L. Ed. 2d 683 (2004) (per curiam).    In applying this standard, the

Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on

the merits in state court where that adjudication "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."    28 U.S.C. § 2254(d)(2).    The

"unreasonable determination of the facts" standard is implicated only to the extent

the validity of the state court's ultimate conclusion is premised on unreasonable

fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with

the "unreasonable application" clause, the federal court applies an objective test.

*Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931

(2003) (holding that a state court decision based on a factual determination "will

not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial

court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

## III. PETITIONER'S CLAIMS

### A. Ground One: "Ineffective assistance of counsel—failed to object to the introduction of highly prejudicial photo-array used to make an out-of-court identification of the defendant."

Petitioner alleges during the trial testimony of one of the victims, Eddric Murray, the prosecutor elicited testimony concerning a photo line-up conducted by the Leon County Sheriff's Department (ECF No. 1 at 4–5). Petitioner alleges the prosecutor asked Mr. Murray if he made any specific marking to indicate the person he identified, intending to elicit Mr. Murray's testimony that he placed his

initials on the photo of the person he identified (*id.*). Petitioner alleges Mr. Murray instead stated, "The tattoo on the face," thus indicating he picked the photo based upon the tattoo (*id.*). Petitioner alleges at the conclusion of Mr. Murray's testimony, the State moved to admit the photo array into evidence (*id.*). Petitioner alleges defense counsel stated he had no objection to admission of the photo array (*id.*). Petitioner contends counsel should have objected to admission of evidence of the photo identification, on the ground that the photo array was unduly suggestive (*id.*). Petitioner alleges his photo was the only photo taken from the neck up and the only photo showing a facial tattoo (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 12 at 14–15). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, and was not contrary to or an unreasonable application of clearly established federal law (*id.* at 15–21).

1. Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's

deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms." *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high.  *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability

sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695. Further, when the claimed error of counsel occurred at the guilty stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting

*Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

2. Federal Review of State Court Decision

Petitioner presented this claim as Ground One of his Rule 3.850 motion (Ex. G at 10–11). Petitioner and his trial counsel, Attorney Daren Shippy, were the only persons who testified at the evidentiary hearing (*id.* at 27–68). With respect to the photo array, Attorney Shippy testified he viewed the photo array as part of trial preparation (*id.* at 45–46). Shippy also testified he was familiar with the standard for exclusion of a photo array as unduly suggestive:

> [I]t's a two-part test that's applied to photo lineups. One, that the photo lineup itself has to be unduly suggestive. And then there's a

> second part that if we pass that threshold then there has to be a substantial likelihood of misidentification.

(Ex. G at 45–46). Attorney Shippy testified he would have moved to exclude the photo array if he believed he had grounds to do so, but he did not believe he had a meritorious basis for seeking to exclude it (*id.* at 46). Attorney Shippy testified that there was other evidence linking Petitioner to the armed robbery, specifically, testimony from Ms. Jackson, who knew Petitioner and testified that Petitioner was one of the three men who robbed the victims (*id.* at 47). Attorney Shippy testified that the victim's identification of Petitioner was "very beneficial" to Petitioner, because the victim testified that Petitioner was the only robber who did not have a gun (*id.* at 48).

On cross-examination by Petitioner at the evidentiary hearing, Petitioner provided Attorney Shippy with the photo array, and Shippy reiterated that he did not believe that the photo array was unduly suggestive:

> Q [by Petitioner]. Okay. sir, with you looking at this, do it—does this not peg you [sic] as being suggestive in any type of way with how the body—I mean, the portion of the body that's set up from me being neck up and everybody else shoulder up; how my face sticks out more? And the defendant—I mean, the victim identified me as having tattoos in my face, how my face is more predominant, and you can view my face better than you can view anyone else's.
>
> A. I guess I would respectfully disagree with you that you stand out more than the others do. They're all—all six African-

American males.  They all have similar hairstyles.  There's nothing that draws your attention to any of them as I look at it personally.

When you talk about the others having their—a little bit more of their shoulders, it appears that Nos. 5 and 6 don't have much of their shoulders in comparison to perhaps 1, 2 and 3, so there's nothing about this photo lineup and my understanding of the applicable law that would have said, hey, you know, he stands out like a sore thumb, if that means any makes [sic] any sense.

Q.    It makes perfect sense, sir.

Okay.  But the fact—I understand perfectly well what you're saying.  But the victim, Mr. Eddrick [sic] Murray, says that he couldn't identify nobody, but he remembered one of the people having tattoos in they [sic] face.  With the way this photo lineup is set up and me being the only one having tattoos in my face, you don't view that as suggestive in any type of way?

A.    Well, in looking at what I'm looking at, I can't see tattoos on·anybody.

Q.    Well, that—that's perfectly understandable.  But you can view me right here right now, and you view I have tattoos in my face.  I didn't have all these tattoos in my face at the time, but I actually had these teardrops, this dollar sign, and I had this, "trust no man," on the side of my left eye.  Those tattoos I had at the time.

I understand that this is not a very good picture because of the darkness after it's been copied, but you can see the tattoos in my face.  So I assume that if anybody else had tattoos in they [sic] face, you would be able to see them as well.

A.    You would hope so.

Q.    Would hope so.

> But my–my only question is, I mean, with how close I am to the camera versus anyone else and me having tattoos in our [sic] face, let's just imagine no one else—since we can't really tell, let's just imagine no one else has tattoos in they [sic] face. You wouldn't view that as being suggestive in any type of manner?
>
> A. I think it's if we assume that the tattoos are—stand out and you're able to see them without any effort and they draw your attention to your photograph, then, I think, when we're talking in a theoretical sense–
>
> Q. Yes, sir.
>
> A. —then there's a possibility they might be unduly suggestive. I don't see that in the photographic lineup that I'm looking at though.
>
> Q. Thank you, sir. That's all I wanted.

(Ex. G at 55–57). The trial transcript, as well as the photo array, was included in the state post-conviction record (*see* Ex. G at 24–25, 31–32, 68, Ex. D, State's Exhibit 6, ECF No. 12-4 at 150–51).

At the conclusion of the evidentiary hearing, the court made the following findings with respect to Ground One:

> On Ground l, I'm going to find that there's nothing suggestive about the lineup in this case, Defendant's 1 that was entered as State's 6 during the trial. Therefore, there's no—there was no legal basis for Mr. Shippy to object and, therefore, no deficient performance and no prejudice.
>
> The victim, Mr. Murray, identified the defendant as one of the three defendants that didn't have any type of mask on and that's why

> he was able to see him clearly and then also testified that he did not have a firearm, but the other two co-defendants did. Other witnesses stated that—at least one other witness stated that the defendant did have a firearm in his hand.
>
> So I'm denying Count I because neither of the *Strickland* prongs have been met.

(Ex. G at 79–80). In the state circuit court's written order denying the Rule 3.850 motion, the court correctly stated the deficient performance and prejudice prongs of the *Strickland* standard as the applicable legal standard (Ex. G at 24). The court denied all of Petitioner's claims on the ground that Petitioner failed to demonstrate deficient performance or prejudice (*id.*). The First DCA affirmed the decision without written opinion (Ex. J).

Attorney Shippy correctly stated the appropriate standard for determining whether an eyewitness identification must be suppressed as tainted by police arrangement. The Supreme Court recently described that standard:

> This Court has previously described "the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement." *Perry v. New Hampshire*, 565 U.S. 228, 238, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). In particular, the Court has said that "due process concerns arise only when law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Id.*, at 238–239, 132 S. Ct. 716 (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), and *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); emphasis added). To be "'impermissibly

suggestive,'" the procedure must "'give rise to a very substantial likelihood of irreparable misidentification.'" *Id.*, at 197, 93 S. Ct. 375 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). It is not enough that the procedure "may have in some respects fallen short of the ideal." *Id.*, at 385–386, 88 S. Ct. 967. Even when an unnecessarily suggestive procedure was used, "suppression of the resulting identification is not the inevitable consequence." *Perry*, 565 U.S., at 239, 132 S. Ct. 716. Instead, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Ibid.* (quoting *Biggers*, *supra*, at 201, 93 S. Ct. 375). "[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation." *Perry*, *supra*, at 239, 132 S. Ct. 716 (quoting *Manson*, 432 U.S., at 114, 97 S. Ct. 2243; alterations in original). The factors affecting reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.*, at 114, 97 S. Ct. 2243. This Court has held that pretrial identification procedures violated the Due Process Clause only once, in *Foster v. California*, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969). There, the police used two highly suggestive lineups and "a one-to-one confrontation," which "made it all but inevitable that [the witness] would identify [the defendant]." *Id.*, at 443, 89 S. Ct. 1127.[FN 2]

> [FN 2: In the first lineup, the suspect was nearly six inches taller than the other two men in the lineup, and was the only one wearing a leather jacket like the one the witness described the robber as wearing. *Foster*, 394 U.S., at 441, 443, 89 S. Ct. 1127. Police then arranged a "one-to-one confrontation" in which the witness sat in the same room as the suspect and spoke to him. *Id.*, at 441, 89 S. Ct. 1127. And in the second lineup, the suspect was the only one in the five man lineup who had been in the original lineup. *Id.*, at 441–442, 89 S. Ct. 1127.].

*Sexton v. Beaudreaux*, – U.S. –, 138 S. Ct. 2555, 2559, 201 L. Ed. 2d 986 (2018). The Supreme Court went on to deny petitioner Beaudreaux's IATC claim, based upon counsel's failure to file a motion to suppress the pretrial identification, because the state court could have reasonably concluded that Beaudreaux failed to prove that, under the totality of the circumstances, the identification was not reliable.  *Id.*, 138 S. Ct. at 2560.  The Court noted that although the eyewitness, Mr. Esho, gave a vague initial description of the shooter, and there was a 17-month delay between the shooting and the identification, Esho had a good opportunity to view the shooter—Esho talked to Beaudreaux immediately after the shooting, and Esho was paying attention during the crime and remembered Beaudreaux's distinctive walk.  *Id.*  Further, Esho demonstrated a "high overall level of certainty" in his identification—he chose Beaudreaux's picture in two photo lineups, and he was "sure" about his identification once he saw Beaudreaux in person.  *Id.*  The Court additionally noted there was "little pressure" on Esho to make a particular identification.  *Id.*

The identification testimony at issue in the instant case is the testimony of Eddric Murray, the victim of the aggravated robbery.  Mr. Murray testified that on October 22, 2011, he was going to work, and his cousin, Freddie Bagley, asked

him if he would drive him to Briarwood Apartment complex (Ex. C at 176–77).
Mr. Murray testified he drove Bagley to Briarwood Apartments, and eventually the
two of them began talking to two females who parked nearby (*id.* at 177–79).  Mr.
Murray testified he got out of the car and stood at the driver's side of the trunk of
his car talking to the girls, while Bagley stayed in the car on the passenger's side
(*id.* at 180).  Murray testified he had been talking to the girls for five minutes,
when three males approached (*id.* at 181).  Mr. Murray testified that two of the
males had their faces fully covered—one with a "full mask" and the other with a
bandana and a hat—so Murray could see only their eyes (*id.* at 181–82).  Murray
testified the third man had nothing covering his face and was African American
(*id.* at 181, 208).  Mr. Murray pointed out Petitioner in the courtroom as that man
who had nothing covering his face (*id.* at 182).  Mr. Murray testified that the two
fully masked men were armed—one of the men had a pistol and the other had a
shotgun (*id.* at 183–84).  Murray testified that the man with no face covering was
not armed (*id.* at 208).  Murray testified that one of the armed men asked for
Murray's money (*id.* at 185).  Murray testified that the man with the shotgun was
standing near the driver's side of Murray's car, and the man with the pistol was on
the passenger's side (*id.* 186).  Mr. Murray testified that the man with the shotgun
told him to walk toward the driver's side, so Murray complied (*id.* at 185–87).

Murray testified that the man on the passenger's side said something, and when Murray looked at him, the man pointed the pistol through the car and shot Murray in the thigh (*id.* at 187). Mr. Murray testified he ran and called a friend who lived in the apartment complex, and the police were called (Ex. B at 44–45, Ex. C at 189). The police and medical personnel arrived (Ex. C at 189). Mr. Murray reported his vehicle as stolen, and law enforcement later found the vehicle at a different location (*id.* at 227–28).

Mr. Murray testified that after he had surgery for the gunshot wound, he went to the sheriff's office to look at a set of photographs (Ex. D at 193). Mr. Murray identified State's Exhibit 6 as the array of photos he was shown (*id.* at 193). The prosecutor questioned Mr. Murray about his viewing of the photos:

> Q.    On the day that you viewed that photographic lineup, were you able to pick out somebody contained in that lineup that you believed to be involved in the robbery?
>
> A.    Yes.
>
> Q.    And did you make any kind of markings that would indicate who it is or where it is that you—or which person it was that you identified?
>
> A.    Yes.
>
> Q.    And what would the markings be?
>
> A.    The tattoo on the face.

Q.    I'm talking about your actual markings.

A.    Yes.  My initials right here (indicating).

Q.    Okay.  So you initialed the photograph, and I believe you also circled a number?

A Yes.

(Ex. C at 194).  The photo array indicates "1/12/12 EM" (ECF No. 12-4 at 151).

Eddric Murray was not the only person who identified Petitioner as one of the robbers.  Ahrielle Jackson testified that Petitioner was her cousin's boyfriend (Ex. C at 121).  Ms. Jackson identified Petitioner in court (*id.* at 121–22).  Ms. Jackson testified that on October 22, 2011, the night of the robbery, she dropped off Petitioner and his two co-defendants (Darnell Cooks and Andre Cooks, both of whom are Ms. Jackson's cousins) on a road just outside of the Briarwood Apartments complex (*id.* at 121–24).  Ms. Jackson testified that she and her friend, Erika Jones, then drove into the apartment complex, and she parked two spaces away from the passenger's side of another vehicle (*id.* at 122–24, 133–34).  Ms. Jackson testified that there were two guys in the other vehicle (*id.*).  Jackson testified that Erika got out and was talking to the guys, and then Jackson did the same (*id.*).  Ms. Jackson testified that as they were standing near the guys' car talking, Petitioner, Darnell, and Andre approached (*id.* at 124–26).  Ms. Jackson

testified that Petitioner was carrying a pistol, and Darnell was carrying a shotgun (*id.* at 126–27). Jackson testified that Petitioner stood near the passenger side of the victims' car, and Darnell stood at the driver's side (*id.* at 129). Ms. Jackson testified Petitioner and Darnell told the two men not to get into their (the victims') car (*id.* at 127–28). Jackson testified that she and Erika backed away and got into her (Jackson's) car (*id.* at 129). Jackson testified that as she was preparing to back out, she heard gunfire and saw one of the guys get shot (*id.* at 130). Ms. Jackson testified she saw Darnell chase one of the guys to the end of the apartment complex (*id.* at 131). Ms. Jackson testified that Petitioner got in the car with her and Erika, and the three of them drove to her (Jackson's) home (*id.* at 131–32).

Freddie Bagley testified he was sitting in Mr. Murray's car on the passenger side, and one of the robbers was pointing a pistol in his face, a second robber was on the driver's side holding a shotgun on Mr. Murray, and the third robber was standing near the trunk of the car on the driver's side "looking" (Ex. B at 71–74). Bagley testified that the robber on the passenger's side with the pistol demanded, "Give me everything you got" (*id.* at 74). Mr. Bagley testified he gave the robber his cell phone and identification, and the robber started reaching into Bagley's pockets (*id.* at 74–75). Mr. Bagley testified the robber with the pistol reached across him and shot Mr. Murray in the thigh (*id.* at 75). Bagley testified he pushed

his way out of the car, ran until he saw someone, and borrowed a phone to call police (*id.* at 75–77). Mr. Bagley testified the officers responded, and he returned to the scene with them, but both cars (Mr. Murray's and the car driven by the females) were gone (*id.* at 77–78). Mr. Bagley testified that the robber with the pistol, who shot Eddric Murray, was Darnell Cooks, but Bagley did not recognize anyone in the courtroom as Darnell Cooks (*id.* at 99, 104, 110).[3]

A fair-minded jurist could conclude that Attorney Shippy was not ineffective for failing to seek to suppress Eddric Murray's identification from the photo line-up. Petitioner has not demonstrated that any of the state court's factual determinations, including the finding that the photo array was not unnecessarily suggestive, were unreasonable in light of the evidence presented in the Rule 3.850 proceeding.

Additionally, a fair-minded jurist could conclude that Mr. Murray's identification was reliable. Mr. Murray testified he had a good opportunity to view one of the robbers, because that robber was not wearing a face covering, and Murray viewed the photo array only three months after the robbery. There is no indication that Mr. Murray was pressured to make a particular identification.

[3] All three defendants were tried together and appeared at trial.

Additionally, Mr. Murray was certain when asked whether he saw the unmasked robber in the courtroom (one year after the robbery) and pointed to Petitioner.

Attorney Shippy also had a sound strategic reason for not seeking suppression of Mr. Murray's identification. The verdict form required the jury to answer the following question with respect to the armed robbery charge:

> If you found Deionta McQueen guilty of Armed Robbery, please answer the following question:
>
> During the commission of the offense, did Deionta McQueen actually possess a firearm?

(Ex. A at 48). The answer to that question determined whether Petitioner was subject to a 10-year minimum mandatory term of imprisonment for actual possession of a firearm (*see id.* at 95–103).

Ms. Jackson testified she knew Petitioner personally, and that he was one of the three robbers, thus providing persuasive evidence of Petitioner's involvement in the robbery. Ms. Jackson also testified that two of the robbers actually carried guns, and Petitioner was one of them. Eddric Murray's testimony was the only evidence which conflicted with Ms. Jackson's on the latter issue. Mr. Murray did not simply identify Petitioner as one of the robbers, he also identified Petitioner as <u>the only robber who did not carry a firearm</u>. By creating a conflict in the evidence

on this issue, Mr. Murray's testimony was potentially beneficial to Petitioner in terms of sentence.

Petitioner has failed to demonstrate that the state court's adjudication of Ground One was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of *Strickland*. Petitioner is not entitled to federal habeas relief on Ground One.

B.   Ground Two: "Ineffective assistance of counsel—failed to place an objection on the record regarding the State's motion in limine regarding recovery of the firearm used to shoot the victim, being recovered in a separate investigation, and a wholly different crime."

Petitioner alleges the State filed a motion in limine to exclude evidence that the pistol used to shoot Eddric Murray was recovered by law enforcement during their investigation of another offense, specifically, a manslaughter investigation of Darnell Cooks'(one of Petitioner's co-defendants) unrelated shooting of a third party (Michelle Cooks) three weeks after the armed robbery of Eddric Murray (ECF No. 1 at 6–7). Petitioner was present when Darnell Cooks shot Michelle Cooks (*see* Ex. G at 59). Petitioner alleges the evidence was conflicting regarding whether he (Petitioner) was armed during the robbery of Eddric Murray (ECF No. 1 at 6–7). Petitioner argues that evidence that Darnell Cooks was investigated for shooting someone else with the same pistol would have been beneficial to

Petitioner' defense, because it would have supported an inference that Cooks, not Petitioner, was more likely armed during the robbery of Eddric Murray (*id.*). Petitioner contends Attorney Shippy was ineffective for failing to oppose the State's motion to exclude any reference to the pistol being recovered during an investigation of Cooks for a collateral crime (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 12 at 22). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, and was not contrary to or an unreasonable application of clearly established federal law (*id.* at 22–27).

1. Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

2. Federal Review of State Court Decision

Petitioner presented this claim as Ground Two of his Rule 3.850 motion (Ex. G at 12–13). At the post-conviction evidentiary hearing, Attorney Shippy testified that he did not believe he had a legal basis to oppose exclusion of the evidence at issue (Ex. G at 49–50). Shippy testified that it was evidence of a co-defendant's collateral crime and was not probative of a material fact at issue in Petitioner's case, and thus irrelevant (*id.* at 31–32, 49–50, 60). Shippy testified that the

evidence was also inadmissible character evidence, and it was unduly prejudicial to the co-defendant, and thus subject to exclusion under Rule 403 of Florida's Evidence Code (*id.* at 32, 50). Attorney Shippy testified that did not believe that the evidence was beneficial to Petitioner, because the jury may perceive that Petitioner was guilty by association (*id.* at 32–33, 50–51, 60).

At the conclusion of the evidentiary hearing, the court made the following findings with respect to Ground Two:

> On Count II, failure to object to the State's Motion in Limine regarding the firearm recovered in the separate incident, the firearm was relevant because it was consistent with the firearm used in this case and, in fact, the shell casing that was found in one of the vehicles—I believe it was the stolen vehicle or the vehicle that the victims drove up in. And the testimony was that the gun was fired by one of the defendants reaching into the vehicle, and then a shell casing was ejected and found there, and that shell casing matched the firearm that was found in the trunk of the vehicle that Mr. McQueen and the other co-defendant were found in.
>
> So the firearm was relevant, but the facts surrounding that other murder investigation and charge were not relevant to this and certainly would have failed a 403 analysis and only would have been more prejudicial to this defendant, Mr. McQueen, as Mr. Shippy testified. So there was no legal basis to object, and getting into that other murder case would have most likely only been negative to the defendant. So there's no deficient performance and no prejudice related to Ground 2.

(Ex. G at 80–81). The First DCA affirmed the decision without written opinion (Ex. J).

Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of *Strickland*, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law." *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted); *see also Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance

claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, as in *Alvord*, *Callahan*, and *Herring*, the state court has already answered the question of whether Attorney Shippy had a legal basis to seek admission of the evidence at issue (i.e., evidence that law enforcement recovered the pistol used to shoot Eddric Murray during the course of a separate manslaughter investigation of Darnell Cooks (*see* Ex. C at 292–95))—he did not, because the evidence was inadmissible under Rule 403 of Florida's Evidence Code. This court must defer to the state court's determination of state law. The failure by Attorney Shippy to oppose the State's motion in limine cannot be deemed deficient performance, and Petitioner cannot show he was prejudiced by

counsel's failure to oppose the motion, because Shippy's opposition had no arguable basis for success.

Petitioner failed to satisfy § 2254(d) with respect to the state court's adjudication of Ground Two. Therefore, he is not entitled to federal habeas relief on this claim.

C.    Ground Three: "Ineffective assistance of counsel—failed to file a motion for new trial pursuant to rule."

Petitioner contends Attorney Shippy was ineffective for failing to make a motion for new trial, on the ground that the weight of the evidence did not support a finding that he was armed during the robbery (ECF No. 1 at 8–9). Petitioner contends the victim, Eddric Murray, testified unequivocally that Petitioner was not armed, and the only evidence to the contrary was Ahrielle Jackson's testimony, but her credibility was impeached by her prior inconsistent statements (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 12 at 28–29). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, and was not contrary to or an unreasonable application of clearly established federal law (*id.* at 29–34).

1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner presented this claim as Ground Three in his Rule 3.850 motion (Ex. G at 14–15).  Attorney Shippy testified he did not believe he had a good faith legal basis for making a motion for new trial based upon the weight of the evidence (*id.* at 51–52, 60).  Shippy explained:

> This would not have been a case that I would have considered that [making a motion for new trial based upon the weight of the evidence] to be applicable to.  I can see it if you had a case where let's say that there were—the defense called three witnesses, and the State called one witness, and, nevertheless, the jury found the defendant guilty based upon the testimony of one witness, disregarding the testimony of three others.  You might consider under those circumstances when you're talking about the weight of the evidence.
>
> But what stands out to me with this case is the evidence was conflicting, but it was conflicting in kind of equal terms as it relates to all three of the defendants which, in my opinion and judgment, would not have been an appropriate basis for filing a motion for new trial.
>
> Q [by the State].   And when you say "conflicting," do you mean the fact that it was conflicting in the sense that not—I guess, not in the sense everybody said they were there; it's just what roles they played while they were there?
>
> A.      I don't remember the specifics, but . . . McQueen got the benefit of the firearm and the conflicting identification as it related to what person had a firearm because I remember that Mr. Eagen [defense counsel for Andre Cooks], I think, was probably feeling better about his chances at trial because there was perhaps earlier investigation that may have suggested that Mr. Andre Cooks didn't

> have possession of the firearm, but it came out a little bit different in the trial to Mr. McQueen's benefit.
>
> But it was not a weight-of-the-evidence situation or argument. I mean, one of the things we like to argue from a defense perspective in closing is the conflicting evidence and how that creates a reasonable doubt for the jury to find a client not guilty. And that's—that came out in spades in Mr. McQueen's case, but not a situation where it was—you know, the evidence was weighted one way more than the other that you felt that a judge was going to reweigh it and then find in favor of you.

(Ex. G at 51–53; *see also id.* at 60–61).

The state circuit court denied Ground Three on the following basis:

> Related to Ground 3, the motion for new trial, Mr. Shippy testified that he didn't have a legal basis to file that. And based on all the testimony today, I'm going to find that there's no deficient performance and no prejudice.

(Ex. G at 81, *see also id.* at 24–25). The First DCA affirmed the decision without written opinion (Ex. J).

Florida Rule of Criminal Procedure 3.600(a)(2) provides that a defendant may move for new trial on the basis that the "verdict is contrary to . . . the weight of the evidence." *See* Fla. R. Crim. P. 3.600(a)(2). When a trial court evaluates a Rule 3.600(a)(2) claim for motion for a new trial, it must consider the weight of the evidence rather than the sufficiency of the evidence. *See Palmer v. State*, 196 So. 3d 1289, 1289–90 (Fla. 1st DCA 2016) (citation omitted). A motion for new trial

"requires the trial court to weigh the evidence and determine credibility just as a juror would." *Bell v. State*, 248 So. 3d 208, 209 (Fla. 1st DCA 2018).  The trial court "acts as a safety value," where evidence of guilt is tenuous but technically sufficient to go to the jury." *Baker v. State*, 262 So. 3d 241, 241–42 (Fla. 1st DCA 2018) (citation omitted).  If the verdict is against the weight of the evidence (i.e., the evidence supporting the verdict is tenuous or insubstantial), the court should grant the motion for new trial.  *See Adams v. State*, 417 So. 2d 826 (Fla. 1st DCA 1982).

The verdict in Petitioner's case was that Petitioner was guilty of armed robbery with a firearm, and that he actually possessed a firearm during commission of the robbery (Ex. A at 48–49).  The jury was instructed on the issue of principal liability (*see* Ex. D at 400–01).  On the issue of actual possession of a firearm, the jury was instructed:

> To actually possess a firearm means that the defendant a) carried a firearm on his person, or b) had a firearm within immediate physical reach, with ready access, with the intent to use the firearm during the commission of the crime.

(Ex. D at 393–94).

All of the evidence was consistent that Petitioner was one of the robbers, and that two of the robbers carried firearms on their persons.  The only conflict in the

evidence was on the issue of which two of the three robbers carried firearms on their persons. Eddric Murray testified that Petitioner did not carry a firearm on his person (thus suggesting that Darnell and Andre Cooks carried the firearms). Freddie Bagley testified that Darnell Cooks (who Bagley also knew as "Tyrone") carried the pistol. Ahrielle Jackson testified that Petitioner (who she also knew as "Terrell") carried the pistol, and Darnell carried the shotgun. No doubt, Ms. Jackson's testimony regarding some facts was inconsistent with her prior sworn statements.[4] However, a fair-minded jurist could conclude that the evidence supporting the verdict was not so tenuous or insubstantial that every competent defense attorney would have made a motion for new trial. Because a fair-minded jurist could draw this conclusion, this federal court cannot say that the state court's adjudication of Petitioner's IATC claim was unreasonable. Petitioner is not entitled to federal habeas relief on Ground Three.

D. Ground Four: "Ineffective assistance of counsel—failed to properly file a pre-trial motion for severance."

Petitioner contends defense counsel was ineffective for failing to file a motion to sever his trial from his co-defendants' trial (ECF No. 1 at 10–11).

[4] Ms. Jackson's testimony and prior statements were inconsistent with respect to (1) which of the two victims was shot, (2) whether Darnell Cooks attempted to fire the shotgun during the robbery, (3) whether she was able to hear what was happening when she got back in

Petitioner alleges the testimony of Eddric Murray "clearly exonerate[d]" him of the crime of which he was convicted, and demonstrated that he did not possess a weapon or shoot Mr. Murray (*id.*). Petitioner contends the evidence regarding the words and actions of his co-defendants confused and misled the jury regarding Petitioner's innocence (*id.*). Petitioner contends he would have been acquitted of the armed robbery charge if defense counsel had moved to sever his case for trial (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 12 at 14–15). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, and was not contrary to or an unreasonable application of clearly established federal law (*id.* at 15–21).

1. Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

2. Federal Review of State Court Decision

her car, and (4) when Petitioner, Andre, and Darnell donned hoodies (before or after Ms. Jackson dropped them off).

Petitioner presented this claim as Ground Four in his Rule 3.850 motion (Ex. G at 16). At the post-conviction evidentiary hearing, Mr. Shippy provided the following explanation for his not seeking a severance:

> Well, when you do some research on that, it's not very favorable to defendants seeking a severance. The fact that it may not be in your best interest or that, you know, someone may be blaming you is not a legally sufficient basis for seeking a motion to sever. The rule sets out that it's got to be necessary to promote a fair determination of the guilt or innocence of the defendant.
>
> I think, uniquely in this case, the three of them going to trial together, the way that the evidence came out was extraordinarily beneficial to Mr. McQueen. He faced significantly more time and more minimum mandatory time. The way that he was charged, if he had been convicted as charged, and because the jury was stuck with looking at three people sitting there, and this conflicting evidence about people being present but having different roles and it wasn't consistent, that he actually got the benefit of the jury not probably being able to determine exactly what happened because they found all three defendants guilty of the same charge and possession of a firearm, which was a little bit at odds with the conflicting nature of the evidence about who had the firearm.

(Ex. G at 53; *see also id.* at 66).

The state circuit court denied Ground Four on the following basis:

> [R]egarding the motion to sever, Mr. McQueen is kind of arguing—he's kind of admitting it's a high legal standard as Mr. Shippy testified and that the law is not favorable to severance for defendants, but Mr. McQueen argues today that there would be no downside of him filing the motion. But there's no reason—you can't file a motion if there's no legal basis, and certainly under the conditions as Mr. Shippy testified and the conditions of this trial,

> there's no deficient performance and no prejudice related to not filing the severance which Mr. Shippy believed would not be granted because having an antagonistic defense is not a sufficient basis to file such a motion.

(Ex. G at 81, *see also id.* at 24–25).  The First DCA affirmed the decision without written opinion (Ex. J).

Attorney Shippy correctly stated Florida's standard for severance of defendants.  Rule 3.152 of the Florida Rules of Criminal Procedure provide that the court shall order a severance of defendants and separate trials (1) prior to trial upon a showing that the order is appropriate to promote a fair determination of the guilt or innocence of one or more defendants, or (2) during trial upon a showing that the order is necessary to achieve a fair determination of the guilt or innocence of one or more defendants.  *See* Fla. R. Crim. P. 3.152(b)(1).  The severance rule provides the trial court with discretion to grant a severance when the jury would be influenced by evidence that is admissible against only one defendant in determining guilt of another defendant, and rule is designed to ensure fair determination of each defendant's guilt or innocence by enabling the presentation of evidence in such a manner that the jury may distinguish evidence properly admitted against each defendant to determine an individual defendant's guilt or innocence.  *See Smith v. State*, 699 So. 2d 629 (1997).  Strategic advantage,

hostility among defendants, or attempts to escape punishment by throwing blame on other defendants are insufficient reasons, standing alone, to justify a severance of defendants. *See Bryant v. State*, 565 So. 2d 1298 (Fla. 1990); *McCray v. State*, 416 So. 2d 804 (Fla. 1982); *Saavedra v. State*, 576 So. 2d 953 (Fla. 1st DCA 1991), *approved* 622 So. 2d 952 (Fla. 1991).

In Petitioner's case, none of the defendants testified; indeed, none of the defendants presented any evidence, with the exception of Petitioner's counsel (Attorney Shippy presented testimony from a fingerprint expert, who examined the shotgun and testified she obtained a fingerprint of value but could not determine whose it was). Further, the State did not offer evidence of any statement of any defendant, or any prior criminal acts of any defendant. The mere fact that there was conflicting evidence regarding which two of the three robbers actually carried firearms, and which one of the robbers shot Eddric Murray, did not provide a legal basis for Attorney Shippy to seek, or the trial court to grant, separate trials for Petitioner and his co-defendants. The state court essentially agreed with Attorney Shippy that there was no legal basis to sever the defendants' trials.

The state court's rejection of Petitioner's IATC claim was not contrary to or an unreasonable application of *Strickland*. Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to substitute Mark S. Inch for Julie Jones as Respondent.

And it is respectfully **RECOMMENDED**:

1. That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2. That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 22nd day of April 2019.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served**

**upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**